LENTZ *v.* LENTZ.

1. DIVORCE—HABITUAL DRUNKENNESS—STATUTES.
   Complainant was correctly denied a divorce on the ground of habitual drunkenness of her husband, who, the testimony showed, was intoxicated on four or five different occasions in distinct years, the last one being two years before the hearing.[1]

2. SAME.
   Habitual drunkenness is the habit of becoming intoxicated as often as the temptation presents itself.  2 Comp. Laws, § 8621.

3. SAME—CRUELTY—CONDONATION.
   A decree denying complainant a divorce was warranted on the ground that she condoned extreme cruelty by continuing to live with her husband after the acts complained of, which were not subsequently revived.

[1] Drunkenness as a ground for divorce, see note in 34 L. R. A. 449.

Appeal from Arenac; Sharpe, J.   Submitted June 10, 1912.   (Docket No. 60.)   Decided July 22, 1912.

Bill by Mary F. Lentz against John C. Lentz for divorce.   From a decree dismissing the bill, complainant appeals.   Affirmed.

*B. J. Henderson*, for complainant.
*William C. Cook*, for defendant.

STONE, J.   In this case the bill of complaint praying for an absolute divorce was filed March 27, 1911, and, as near as we can gather from the record, the case, being at issue, was heard in June of the same year, the testimony having been taken in open court, as in a suit at law.

At the time of the filing of the bill the complainant and appellant was about 49 years of age, and the defendant about 55 years old.   The parties were married December 28, 1882, and had lived together upwards of 25 years.   There were born to them five children, all of whom have grown to manhood and womanhood, the eldest at the time of the filing of the bill being 27 years old, and the youngest 20 years old.   Prior to the marriage the complainant had been a teacher in the public schools in the vicinity of the residence of the parents of the defendant, and the defendant had been, as a young man, engaged in logging and sawmill work connected with his father's business.   For the greater part of their married life the parties lived on a farm of 160 acres, the title to 40 acres of which, including the dwelling house, is in the name of complainant; the remainder being owned by the defendant.

The complainant charges the defendant with habitual drunkenness and extreme cruelty.   Upon the subject of habitual drunkenness, most of the testimony on the part of complainant was directed to four or five specific occasions of intoxication, one in the year 1903 or 1904, one in the year 1905, one in the year 1906, and one in the year 1907.   The occasion in 1903 or 1904 was a Hallowe'en jubilee giv-

en by one of the neighbors. Complainant testified that on that occasion defendant came home between 2 and 3 o'clock in the morning smelling so strongly of liquor that she was obliged to leave the bed and go into another room to sleep. She further testified as follows:

"In the morning when I went into the room to dress there was nothing said, and I went on and got breakfast for the threshers who were there at that time, and the family. I went down cellar after breakfast, and I could hear Mr. Lentz making an awful noise upstairs. The maid was washing the dishes when I came up, and I said to her: 'I wonder what he is hollering about, talking about shooting.' I went toward the bedroom door, and he was lying on his stomach, and had his hand out reaching for his pants, and he said he would shoot, calling me the same name that he generally did when he was in that condition. I was frightened and told some of the children, I do not remember which one, to go to the barn and have some of the men come over, and Joe Youngman came and took his pants away and took the revolver out of them, and gave it to me, and told me to put it away where he would not get it again. Mr. Lentz stayed in bed that day until after the threshers had got all through and left, the boys looking after the business."

Referring to the intoxication in 1905, complainant testified:

"In the spring of 1905 he had an accident in Standish while he was in an intoxicated condition, which resulted in a damage suit which cost him between $600 and $700. I was at home when he arrived there after the accident, but I did not see very much of him. A man brought him there who he said was the deputy sheriff, came to drive his horses and bring him home. I don't think he came in the house at all. I just saw him lying up against the house, and he went off somewhere. My son Estey had to take the deputy sheriff back with the team.

"*The Court:* Did you see enough of Mr. Lentz to know what his condition was?

"*A.* Well, he was standing or leaning against the corner of the house."

Speaking of the intoxication in 1906, the complainant testified as follows:

"The boys had measles four or five years ago. First one would come down with them and then another. They were not sick very long, but it was a week anyway. During all the time that the boys were sick with the measles he was not at home. I learned later that he was in Standish, and I supposed he did not know enough to come home by reason of intoxication."

Referring to the intoxication in 1907, complainant further testified as follows:

"A day or two before Thanksgiving, 1907, he went to a bee, and did not come back until evening. I could hear him coming down the road yelling. I was washing the dishes when he came to the house. A couple of men brought him to the house, but I did not see who they were. I was standing at the door holding it open, and I looked out and saw that two men had brought him home, and I said, 'You need not bring him here, just take him where he got his whisky and keep him there,' but they went right on, and I shut the door, and just as soon as I did Mr. Lentz began to kick the panels out, and the next minute the door fell down, and he commenced calling me names, and I ran.

"*Q.* Just tell the court the language he used.

"*A.* I can remember the words, but I do not like to say them. When he went through into the dining room, the door was closed, anyway he closed it behind him, and I ran out into the yard, and I saw my boy over at the barn doing the chores, the youngest boy, and he came to the house just as I ran out the front door, and I saw that he was going in through the house, through the back door, and I ran around to the south window where I could look into the kitchen, and see what was going on, and the two of them were clinched. The table was in the center of the room and the chairs on the side of the room, and Mr. Lentz was falling around on the chairs. Earl was about 16 or 17 then, and had been sick with appendicitis, and was weak, and I was real frightened for fear he would get hurt, and I ran across the road to Mr. Bowers, and told him to come over. Frank Bowers and George Loamoria came over home with me, and, the door being down, they helped to get some hinges off of another door and put it up, and I told them that I was going down to my brother's, that I would not stay there, and they said they would take Mr. Lentz, and take care of him that night,

for me not to go away, and they took him and kept him all night, and I stayed home. I was preparing to have company for Thanksgiving time and I had to give it up; the house being all kicked to pieces in such a drunken brawl that I did not feel like having anybody there. He also kicked the panels out of the door between the dining room and kitchen. Neither of the doors was locked, and there was nothing to prevent him walking right through. The house that this occurred in belongs to me individually."

She further testified generally that the defendant would frequently go to town to do business and stay two or three days at a time, and this conduct became more frequent the last two or three years that they lived together; that it grew on him, and his disposition got worse; that during the times he was under the influence of liquor he would come home and "make a scaring," and tell complainant and the chidren to get out; that the last time he came home he said things would have to be run differently; that he was going to run the business himself; and that things would be fixed up differently. This appears to have been shortly before the bill was filed, and just before the lease hereinafter referred to expired. On cross-examination the complainant testified as follows:

"*Q.* How many times have you seen him intoxicated in the last two years?

"*A.* Well, I have only seen him once.

"*Q.* How long ago !

"*A.* I think it was two years ago last Christmas [1908].

"*Q.* You have not seen him under the influence of liquor in two years?

"*A.* I think it has been two years since I have seen him intoxicated.

"*Q.* He has not been drinking then in the last two years?

"*A.* I don't know what he has been doing. I presume he has.

"*Q.* You didn't see him drinking inside of two years?

"*A.* No.

"*Q.* How many times in the last two years has he been to your place?

"*A.* Why, he would be there off and on when he was not somewhere else. He would come there and stay a few days at a time. * * *

"*Q.* Then, since Thanksgiving, 1907, you have lived with John as his wife, have you?

"*A.* Yes, sir.

"*Q.* How long is it since you ceased to cohabit with John as his wife?

"*A.* Well, I don't know the date, but about the 1st of May three years ago.

"*Q.* And you have lived with him for the last three years as his wife; that is, when he would come back and stay at the place?

"*A.* Well, as near as I can remember the last time was about one month after the boys rented the farm."

It appears that on March 28, 1908, the two oldest sons rented the farm from the parties for a term ending April 1, 1911. This included the dwelling house and the entire 160 acres above referred to. The complainant lived with the boys and kept house for them. There seems to have been a good deal of friction between the defendant and the boys. For a time the defendant appears to have made his home at the common dwelling house, having a room there, but after some trouble with the boys, growing out of the use of a fence wire stretcher that was on the farm belonging to the defendant, which the boys had agreed to use on a farm of defendant's sister, which displeased the defendant, and led to a personal encounter between him and the boys, resulting in their getting possession of the instrument, he seems to have left the home, and has most of the time since resided elsewhere.

The evidence bearing upon the question of extreme cruelty has already been foreshadowed in what has appeared in the testimony above quoted. There is no claim made by complainant of actual personal violence. The cruelty complained of consisted of threats and abusive language while intoxicated, and the trouble which defendant seems to have had with the boys, especially the two older ones, in connection with their working the farm. It is the claim of the defendant, and he gave evidence tend-

ing to show, that there had never been any serious trouble between him and his wife until after the boys rented the farm, that in his differences with them the complainant uniformly sided with the boys, and he claimed that matters became so unpleasant that he was denied a place at the family table, and that he was really driven away from his home. He not only testified himself, but produced a number of witnesses to show that during the two years immediately preceding the hearing he had not been intoxicated at all. He admits that he from his boyhood has drunk liquor occasionally, but not to excess; that his wife knew of this habit when she married him, and it appears in complainant's testimony that she had at least heard of his drinking before she married him. We have already quoted sufficient of the record to show the general trend of the testimony. We have read it all carefully, and it would not be profitable to repeat more of it.

The circuit judge, who heard and saw the witnesses testify, dismissed the bill, and denied the relief prayed for, upon the ground that the evidence did not show that the defendant was an habitual drunkard, and that he could not grant a decree on the ground of extreme cruelty under the evidence in the case. It might be urged with much force that complainant condoned the bad conduct of the defendant complained of, down to and including Thanksgiving, 1907, and that since that time the evidence does not show any revival of such ill conduct on his part.

The court announced the following opinion when ordering the bill dismissed:

"The counsel I think are practically agreed upon the definition of 'habitual drunkenness.' The bill in this case charges habitual drunkenness and extreme cruelty; aside from the drunkenness, I do not think it can be said that the proof of extreme cruelty is such as would entitle the complainant to a decree. These parties have lived together 25 years and more, and I doubt whether there are very many families living in Arenac county, situated as they have been, that have brought up a family that have not had more trouble than these parties have had, aside

from the defendant's intoxication; so I do not think I should grant a decree in this case on the ground of extreme cruelty. Now, the question of whether or not the complainant has made out a case of habitual drunkenness, there might be some doubt about it. I think habitual drunkenness means just what counsel suggests. I think that it means that a man gets drunk whenever a reasonable opportunity offers for it. I do not think it means that whenever he comes to town he must get drunk, but I think it does mean that whenever there is a reasonable opportunity for his intoxication he gets intoxicated. In my judgment there is not a charge made that is so easily proven as habitual drunkenness by proofs outside the family. If this man is an habitual drunkard, there are a hundred people in Standish who know it, and know it just as well as the complainant knows it, because it does not appear that his drunkenness was brought about by his taking liquor home and drinking it there. Now, if counsel will examine the testimony of the witnesses in this case, I do not think there is any evidence at all to establish the fact that this man is an habitual drunkard. There is evidence, of course, that he gets intoxicated, but intoxication is not a ground for divorce. If it was, there would be very many divorces granted in this and other counties. The intoxication must become habitual. As I say, if this man Lentz has lived within four or five miles of Standish all his lifetime, and all the liquor he gets apparently he gets here so far as the evidence tends to show, and if he is an habitual drunkard, as I say, I think there could be 20 or 50 business men in Standish called to establish that fact. I do not think under the evidence in this case I can say that this man is an habitual drunkard."

We are impressed in this case with the fact that nearly all of the evidence adduced on the part of the complainant consisted of her own testimony and that of her sister and boys; the testimony of the latter, with the exception of the specific occasions referred to, being very general, so general in fact as to say "we expected him to come home drunk every time he left home." And yet both they and complainant testified that on very many occasions he did not come home drunk. On the part of defendant, a number of neighbors, who have known the parties since their marriage, testified that they had not seen defendant

drunk more than once or twice in the last three or four years.  This court said, speaking of habitual drunkenness:

"One who has the habit of indulging in intoxicating liquors so firmly fixed that he becomes intoxicated as often as the temptation is presented by his being in the vicinity where liquors are sold is an habitual drunkard within the meaning of the divorce law," [3 Comp. Laws, § 8621]. *Magahay* v. *Magahay*, 35 Mich. 210.

See, also, *Rapp* v. *Rapp*, 149 Mich. 219 (112 N. W. 709).

The most that can be said, giving the testimony of complainant full credence, is that defendant was occasionally under the influence of intoxicants.  This is not in our opinion the habitual drunkenness contemplated by the statute.  *Meathe* v. *Meathe*, 83 Mich. 150 (47 N. W. 109); *Tierney* v. *Tierney*, 169 Mich. 600 (135 N. W. 654).  We are of opinion that we should not disturb the finding of the circuit judge, who seems to have considered the evidence very carefully and reached, in our judgment, the only conclusion warranted by the evidence.

The decree of the circuit court is affirmed, but without costs to either party.

MOORE, C. J., and STEERE, MCALVAY, BROOKE, OSTRANDER, and BIRD, JJ., concurred.  BLAIR, J., did not sit.